**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| YOUSEF ALHINDI, *individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>SANITAS USA, INC., MEHARRY HEALTH NETWORK, P.C., and GUIDEWELL-SANITAS I, LLC,<br><br>Defendants. | CASE NO. 1:25-cv-22910<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Yousef Alhindi ("Plaintiff") brings this class action lawsuit individually on behalf of himself and all others similarly situated, by and through undersigned counsel, and hereby alleges the following against Defendants Sanitas USA, Inc., Meharry Health Network, P.C., and GuideWell-Sanitas I, LLC (collectively, "Sanitas").[1] Facts pertaining to Plaintiff and his experiences and circumstances are alleged based upon personal knowledge, and all other facts alleged herein are based upon investigation of counsel and—where indicated—upon information and good faith belief.

## NATURE OF THE ACTION

1. Plaintiff brings this class action lawsuit to address Sanitas' illegal and widespread practice of disclosing its patients' confidential personally identifiable information ("PII") and

[1] Upon information and good faith belief, Defendants operate the brand "Sanitas Medical Center" and its website in partnership (as a joint venture) and are jointly and severally liable for the violations alleged herein.

protected health information ("PHI") to unauthorized third parties, including Meta Platforms, Inc. d/b/a Meta and Google LLC.

2. Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences including, but certainly not limited to, discrimination in the workplace or denial of insurance coverage.[2]

3. Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to any unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

4. The need for data privacy, security and transparency is particularly acute when it comes to the rapidly expanding world of digital telehealth providers; of all the information the average internet user shares with technology companies, health data is some of the most extensive, valuable and controversial.[3]

---

[2] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022) https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), https://www.statnews.com/2022/06/16/facebook-meta-pixel-hospitals-data/.

[3] Protected and highly sensitive medical information collected by telehealth companies includes many categories from intimate details of an individual's conditions, symptoms, diagnoses and treatments to personally identifying information to unique codes which can identify and connect individuals to the collecting entity. *See* Molly Osberg & Dhruv Mehrotral, *The Spooky, Loosely Regulated World of Online Therapy*, JEZEBEL (Feb. 19, 2020), https://jezebel.com/the-spooky-loosely-regulated-world-of-online-therapy-1841791137.

5. Defendants operate, control and manage over seventy clinics under the brand name Sanitas Medical Center in the United States, with locations in Florida and Tennessee.[4]

6. As part of its medical business, Sanitas owns, controls and maintains the website mysanitas.com (the "Website") and its webpages, including the patient portal (together with the Website the "Web Properties") which it encourages their patients to use to, among other things, (i) locate the nearest medical clinic, (ii) locate and choose medical providers, (iii) book appointments, (iv) check in online, (v) request medical records and (vi) pay bills.[5]

7. Sanitas' unlawful privacy violations occurred and continue to occur because of third-party tracking technologies that it installed on its Web Properties including, but not limited to, the Meta Pixel, Google Analytics, Google DoubleClick Ads, and Google Tag Manager (collectively, "Tracking Tools").[6]

8. The Tracking Tools that Sanitas used allowed unauthorized third parties to intercept the contents of patient communications, view patients' PHI and PII, mine it for purposes unrelated to the provision of healthcare and further monetize it to deliver targeted advertisements, among other things.

9. By designing its Web Properties in the manner described throughout this Complaint, Sanitas knew or should have known that its patients would use the Web Properties to communicate PHI and PII in conjunction with obtaining and receiving medical services from it.

---

[4] *See* https://www.mysanitas.com/en/locations.

[5] *See* https://www.mysanitas.com/; https://mycare.mysanitas.com/login.

[6] This Complaint contains images demonstrating certain Meta and Google tracking tools embedded on the Web Properties. Without the benefit of discovery Plaintiff does not have the ability to determine every tracking tool that has been installed on the Web Properties and their historical configuration.

10. Operating as designed and as implemented by Sanitas, the Meta Pixel and Google Analytics allowed the PHI and PII that Plaintiff and Class Members submitted to Sanitas to be unlawfully disclosed to Meta and Google alongside their unique identifiers (the "FID", "_ga" or "CID" cookies), IP address and other static personal identifiers in violation of HIPAA, state laws, industry standards and patient expectations.

11. By installing Tracking Tools, including the Meta Pixel and Google Analytics, on its Web Properties, Sanitas effectively planted a bug on Plaintiff's and Class Members' web browsers that caused their communications to be intercepted, accessed, viewed and captured by third parties in real time, as they were communicated by patients based on Sanitas' chosen parameters.

12. Plaintiff and Class Members used Sanitas' Web Properties to submit information related to their past, present or future health conditions, including, for example, searches for specific medical treatment and the booking of medical appointments.[7] Such PHI would allow a third party, such as Google or Facebook, to know that a specific patient was seeking confidential medical care from Sanitas as well as the type of medical care being sought.

13. Simply put, the health information disclosed through the Tracking Tools is personally identifiable.

14. Sanitas is a healthcare entity and thus its disclosure of health and medical communications is tightly regulated. The U.S. Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect

[7] Without the benefit of discovery Plaintiff does not have the ability to determine all data categories that were collected in the past, but upon information and good faith belief, Plaintiff believes that Sanitas has captured more data on its Web Properties through Tracking Tools in the past than what is currently reflected on Defendants' Web Properties.

PHI. Under the HIPAA Privacy Rule, no health care provider may disclose a person's personally identifiable protected health information to a third party without express written authorization.[8]

15. Healthcare patients simply do not anticipate or expect that their trusted healthcare provider will send personal health information collected via its webpages to a hidden third party—let alone Google and Facebook, which both have a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without patients' consent. Neither Plaintiff nor any other Class Member signed a written authorization permitting Sanitas to send their PHI and PII to Facebook or Google.

16. As discussed by the Honorable William J. Orrick in a decision concerning the use of the Facebook Pixel by healthcare organizations,

> Our nation recognizes the importance of privacy in general and health information in particular: the safekeeping of this sensitive information is enshrined under state and federal law. The allegations against Meta are troubling: Plaintiffs raise potentially strong claims on the merits and their alleged injury would be irreparable if proven.[9]

17. Consequently, Plaintiff brings this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein, to enjoin Sanitas from making similar disclosure of its patients' PHI and PII in the future, and to fully articulate, *inter alia*, the specific PHI and PII it disclosed to third parties and to identify the recipients of that information.

18. Sanitas breached its statutory and common law obligations to Plaintiff and Class Members by, *inter alia*: (i) failing to remove or disengage technology that was known and designed to share web-users' information; (ii) failing to obtain the written consent of Plaintiff and Class

---

[8] *See Summary of the HIPAA Privacy Rule* (Oct. 19, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

[9] *In re Meta Pixel Healthcare Litig*., 647 F. Supp. 3d 778, 783 (N.D. Cal. 2022).

Members to disclose their PHI and PII to Google, Facebook or other third parties; (iii) failing to take steps to block the transmission of Plaintiff's and Class Members' PHI and PII through Tracking Tools like Google Analytics or the Meta Pixel; (iv) failing to warn Plaintiff and Class Members and (v) otherwise failing to design, and monitor its Web Properties to maintain the confidentiality and integrity of patient PHI and PII.

19. As a result of Sanitas' conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) diminution of value of their PHI and PII, (iv) statutory damages and (v) the continued and ongoing risk to their PHI and PII.

20. Plaintiff seeks to remedy these harms and brings causes of action for (i) Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511; (ii) Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.*; (iii) Invasion of Privacy; (iv) Breach of Confidence; (v) Negligence; (vi) Breach of Implied Contract; and (vii) Unjust Enrichment.

## PARTIES

21. Plaintiff Yousef Alhindi is, and at all relevant times was, an individual residing in the State of Tennessee.

22. Defendant Sanitas USA, Inc. is a Florida company with its principal place of business located at 8400 N.W. 33rd Street, Suite 201, Doral, Florida 33122.

23. Defendant GuideWell-Sanitas I, LLC is a Florida company with its principal place of business located at 8400 N.W. 33rd Street, Suite 201, Doral, Florida 33122.

24. Defendant Meharry Health Network, P.C. is a Tennessee company with its principal place of business located at 1648 Memorial Boulevard, Murfreesboro, Tennessee 37129.

25. Upon information and good faith belief, Defendants operate Sanitas Medical Center as a joint venture and as such control the Web Properties jointly.

26. Defendants are healthcare providers and covered entities under HIPAA.

**JURISDICTION & VENUE**

24. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under federal law, including ECPA, 18 U.S.C. § 2511, *et seq*.

25. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

26. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than one hundred members in the proposed Class, and at least one member of the class is a citizen of a state different from Defendants.

27. This Court has personal jurisdiction over each individual Defendant because (1) Sanitas USA, Inc. and GuideWell-Sanitas I, LLC both operate and maintain a principal place of business in this District, and (2) Meharry Health Network, P.C. is a member of the joint venture among the Defendants, and this joint venture results in performance in this District.[10] Further, Defendants are authorized to and regularly conduct business in this District and make decisions regarding corporate governance and management of the Web Properties in this District.

28. Venue is proper under 28 U.S.C. §§ 1391(b)(1)-(2) because Sanitas maintains a principal place of business is in this District and a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District, including decisions made by Sanitas'

---

[10] *See Terry v. Carnival Corp*., 2018 WL 1894728, at *5 (S.D. Fla. Jan. 18, 2018) ("[T]he *members* of a joint venture ... are subject to a forum state's exercise of personal jurisdiction over them if the joint venture contemplates and actually involves performance in that state.") (quoting *Sabo v. Carnival Corp.*, 762 F.3d 1330, 1337 (11th Cir. 2014)).

governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiff's and Class Members' PHI and PII.

## COMMON FACTUAL ALLEGATIONS

### A. Sanitas Installed Google Tracking Code on its Web Properties.

29. Alphabet Inc., the parent holding company of Google, generates revenue primarily by delivering targeted online advertising through Google, which is the creator of the Google Source Code and an established advertising company.

30. Google creates code that website developers can install on their websites to track user activity. Whenever a user visits a website that is running Google tracking code, Google's code directs the user's browser to send a separate and concurrent communication to Google without the user's knowledge.

31. The information that is intercepted and transmitted to Google via the Google tracking code includes: (i) the URL of the specific webpage a user is trying to access; (ii) the user's IP address; (iii) the user-agent, which identifies the user's device platform and browser; (iv) the user's geolocation, if available; (v) the Referrer, which is the URL of the page on which the user clicked a link to access a new page; (vi) event data, which describes how users interact with a website; and (vii) actual search queries on the website.

32. Google tracking code tells Google exactly what a user's browser communicated to the website.

33. The user's communications to the website are transmitted to Google together with cookies and other unique identifiers that Google can use to match the communications to individuals who use Google's services.

34. Information sent to Google is sent alongside the users' unique identifiers (such as the Google Analytics "cid" cookie and "DSID" and/or "IDE" cookies from DoubleClick), thereby allowing individual patients' communications with Sanitas, and the PHI and PII contained in those communications, to be linked to their unique Google accounts and therefore their identity.[11]

35. Google Analytics also uses certain "first-party" cookies like _ga and _gid to track users' activities on non-Google websites.[12]

36. In addition to information gleaned from a user's unique ID, Google can create a unique, digital "fingerprint" for a user based on data transmitted via Google Source Code, which allows Google to link certain web activity to a user.

37. This "fingerprint" can consist of information regarding a user's screen depth, screen resolution, browser name and version, and operating system name and version, as well as a user's Internet Protocol ("IP") address.

38. With that information, Google can link data acquired through Google Analytics to a particular user.[13]

39. Browser-fingerprints are also considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

40. Browser-fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

---

[11] *See Brown v. Google LLC*, 685 F. Supp. 3d 909 (N.D. Cal. 2023) (quoting Google employee deposition testimony explaining how Google tracks user data).

[12] A first-party cookie is "created by the website the user is visiting"—in this case, Sanitas' Website. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Google.

[13] In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users. *See* https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

41. After tracking, intercepting, and acquiring user's information, Google uses the information for personalized advertising in its advertising systems which includes, but is not limited to, Google Analytics.

42. For example, Google Analytics uses the information it collects to facilitate its Audience Targeting feature. Audience Targeting refers to serving ads to only a select number of users who share certain common characteristics.

43. For Google's Audience Targeting, Google can target ads to either "Pre-defined Google Audiences" or "Advertiser-curated Audiences." Pre-defined Audiences are those created by Google based on interest and demographic data. Advertiser-curated Audiences are customized audiences created by Google through the use of the Source Code, including audiences created through Google Analytics.

44. Google is therefore able to monetize the information surreptitiously intercepted, with Sanitas' help, from visitors to Sanitas' Web Properties.

45. Google logs a user's browsing activities on non-Google websites and uses this data for serving personalized ads.

**B. Sanitas Installed and Configured Facebook Tracking Tools on its Web Properties.**

46. Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[14]

47. In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Sanitas, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

---

[14]*Facebook, Meta Reports Fourth Quarter and Full Year 2021 Results*, https://s21.q4cdn.com/399680738/files/doc_financials/2021/q4/FB-12.31.2021-Exhibit-99.1-Final.pdf.

48. Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications and servers, thereby enabling the interception and collection of website visitors' activity.

49. Specifically, the Pixel "tracks the people and type of actions they take."[15] When a user accesses a webpage hosting the Pixel, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers. Notably, this transmission does not occur unless the webpage contains the Pixel.

50. The Pixel is customizable and programmable, meaning that the website owner controls which of its web pages contain the Pixel and which events are tracked and transmitted to Facebook.

51. The process of adding the Pixel to webpages is a multi-step process that must be undertaken by the website owner.[16]

52. Facebook guides the website owner through setting up the Pixel during the setup process. Specifically, Facebook explains that there are two steps to set up a pixel: "(1) Create your pixel and set up the pixel base code on your website. You can use a partner integration if one is available to you, or you can manually add code to your website. (2) Set up events on your website to measure the actions you care about, like making a purchase. You can use a partner integration, the point-and-click event setup tool, or you can manually add code to your website."[17]

53. Aside from the various steps to embed and activate the Pixel, website owners, like Sanitas, must also agree to Facebook's Business Tools Terms by which Facebook requires website

---

[15] RETARGETING, https://www.facebook.com/business/goals/retargeting.

[16] Business Help Center: Set up and install the Meta Pixel, https://www.facebook.com/business/help/952192354843755?id=1205376682832142.

[17] *Id*.

owners using the Pixel to "represent and warrant" that they have adequately and prominently notified users about the collection, sharing and usage of data through Facebook's Business Tools (including the Pixel)[18] and that websites "will not share Business Tool Data . . . that [websites] know or reasonably should know . . . includes health, financial information or other categories of sensitive information . . . ."[19]

54. Even with these protocols in place, Meta prohibits the disclosure of Business Tools Data "that you know or reasonably should know . . . includes health, financial information or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."[20]

55. Transmission of users' data and communications only occurs on webpages that contain the Pixel.

56. Stated differently, Plaintiff's and Class Members' PHI and PII would not have been disclosed to Facebook but for Sanitas' decisions to install the Pixel on its Web Properties.

57. As explained in more detail below, this secret transmission to Facebook is initiated by Sanitas' source code concurrently with Plaintiff's and Class Members' communications to their intended recipient, Sanitas.

---

[18] *Meta Business Tools Terms*, § 3(c)(i), https://www.facebook.com/legal/technology_terms.

[19] *Id.*; *see also* Pratyush Deep Kotoky, *Facebook collects personal data on abortion seekers: Report* (June 16, 2022), https://www.newsbytesapp.com/news/science/facebook-collects-personal-data-on-abortion-seekers/story (quoting Facebook spokesman Dale Hogan as saying that it is "against [Facebook's] policies for websites and apps to send sensitive health data about people through [its] Business Tools").

[20] *Meta Business Tools Terms* , § 1(h), https://www.facebook.com/legal/technology_terms.

### C. Sanitas Intercepted and Disclosed Patients' Communications with its Web Properties to Unauthorized Third Parties.

58. Sanitas' Web Properties are accessible on mobile devices and desktop computers and allow patients to communicate with Sanitas regarding their medical care and bills.

59. Sanitas encouraged patients to use its Web Properties to communicate their PHI, schedule appointments, access information about their treatments, pay medical bills and more.

60. Despite this, Sanitas purposely installed Tracking Tools on its Web Properties and programmed specific webpages to surreptitiously share its patients' private and protected communications, including Plaintiff's and Class Members' PHI and PII, which was sent to Facebook, Google and other unauthorized third parties.

61. The Tracking Tools followed, recorded and disseminated patients' information as Sanitas patients navigated and communicated with Sanitas via the Web Properties, simultaneously transmitting the substance of those communications to unintended and undisclosed third parties.

62. The information disseminated by the Tracking Tools and intercepted by third parties constitutes PHI including medical information patients requested or viewed, the title of buttons clicked (such as the "Mental Health" button located on the login home page), the exact phrases typed into text boxes, selections made from drop-down menus or while using filtering tools and other sensitive and confidential information, the divulgence of which is and was highly offensive to Plaintiff.

63. This is PHI because these webpages have access to information that relates to an individual's past, present, or future health, health care, or payment for health care. In this case, Plaintiff's or a specific Class Member's past, present, of future health.

64. The information collected and disclosed by Sanitas' Tracking Tools is not anonymous and is viewed and categorized by the intercepting party on receipt.

65. The information Google received via the Tracking Tools, including patients' PHI, was captured through a computer code (created by Google) that tracks, intercepts, and acquires user's information as they visit websites.

66. Google stores users' logged-in identifier on non-Google websites in its logs. Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses this data to serve personalized ads.[21]

67. Google tracking code tells Google exactly what a user's browser communicated to the website.

68. Similar to Google, information Facebook received via the Tracking Tools, including patients' PHI, was linked and connected to patients' Facebook profiles (via their Facebook ID or "c_user id"), which includes other PII.

69. Simply put, the health information that was disclosed via the Google and Facebook Tracking Tools is personally identifiable and was sent to unauthorized third parties alongside other persistent unique identifiers such as the patients' IP address, unique Google identifiers, Facebook ID and device identifiers.[22]

70. Both Google and Facebook are therefore able to monetize the information surreptitiously intercepted, with Sanitas' help, from visitors to Sanitas' Web Properties.

---

[21] *See Brown v. Google LLC*, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (order denying summary judgment and citing internal evidence from Google employees).

[22] *See Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1056 (N.D. Cal. 2021) (discussing how Google collects personal information and IP addresses); *see also* https://developers.facebook.com/docs/meta-pixel/.

**D. Sanitas' Interception of HTTP Requests and Transmission of HTTP Requests.**

71. When patients used Sanitas' Web Properties, they engaged in an ongoing back-and-forth exchange of electronic communications with Sanitas wherein their web browser communicated with Sanitas' computer server. These communications are invisible to ordinary consumers, but one browsing session may consist of thousands of individual HTTP Requests and HTTP Responses.

72. A patient's HTTP Request essentially asks Sanitas' Web Properties to retrieve certain information (such as a "Get Care Now" page), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons and other features that appear on the patient's screen as they navigate Sanitas' Web Properties).

73. Every webpage is comprised of both Markup and "source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

74. Sanitas' Tracking Tools were embedded in its Web Properties' source code, which is contained in its HTTP Response. The Tracking Tools, which were programmed to automatically track patients' communications and transmit them to third parties, executed instructions that effectively opened a hidden spying window into each patients' web browser, through which third parties intercepted patients' communications and activity.

**E. Defendants Disclosed Plaintiff's and Class Members' PHI and PII to Google and Facebook Using Tracking Tools.**

75. Sanitas employed Tracking Tools to intercept, disclose, and re-direct Plaintiff's and Class Members' PHI and PII to Google, Facebook, and other third parties.

76. Sanitas' source code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Sanitas and to send those

communications to Google and Facebook. These transmissions occur contemporaneously, invisibly and without the patient's knowledge.

77. Thus, without its patients' consent, Sanitas used its source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Google, Facebook and other third parties to listen in on all of their communications with Sanitas and thereby intercept those communications, including PHI and PII.

78. The Tracking Tools, including Google Analytics, allow Sanitas to optimize the delivery of ads, measure cross-device conversions, create custom audiences and decrease advertising and marketing costs. However, Sanitas' Web Properties do not rely on the Tracking Tools to function.

79. While seeking and using Sanitas' services as a medical provider, Plaintiff and Class Members communicated their PHI and PII to Sanitas via its Web Properties.

80. Plaintiff and Class Members were not aware that their PHI and PII would be shared with third parties as it was communicated to Sanitas because, amongst other reasons, Sanitas did not disclose this fact.

81. Plaintiff and Class Members never consented, agreed, authorized or otherwise permitted Sanitas to disclose their PHI and PII to third parties, nor did they intend for anyone other than Sanitas to be a party to their communications (many of them highly sensitive and confidential) with Sanitas.

82. Sanitas' Tracking Tools sent non-public PHI to third parties like Google and Facebook, including but not limited to Plaintiff's and Class Members': (i) status as medical patients; (ii) health conditions; (iii) prescribed medications; (iv) medical treatments; (v) appointment booking information; (vi) the specific locations where the patient sought treatment

and (vii) specific words and phrases the user typed into the Website's search bar, including searches for treatment and information related to their medical conditions.

83. Importantly, the PHI and PII Sanitas' Tracking Tools sent to third parties included PII that allowed those third parties to connect PHI to a specific patient.

84. Information sent to Google is sent alongside the users' unique identifier such as the CID cookie from Google Analytics and DSID or IDE cookies from DoubleClick, thereby allowing individual patients' communications with Sanitas, and the PHI and PII contained in those communications, to be linked to their unique Google accounts and therefore their identity.[23]

85. Google receives the contents of patients' communications alongside data that individually identifies anyone with an existing Google account such as an email address "Gmail" or YouTube account.

86. Information sent to Facebook was sent alongside Plaintiff's and Class Members' Facebook ID, thereby allowing individual patients' communications with Sanitas and the PHI and PII contained in those communications to be linked to their unique Facebook accounts and therefore their identity.[24]

87. A user's Facebook ID is linked to their Facebook profile, which contains a wide range of demographic and other information about the user including, but not limited to, location, pictures, personal interests, work history and relationship status. Because the user's Facebook ID

---

[23] *See Brown v. Google LLC*, 685 F. Supp. 3d 909 (N.D. Cal. 2023) (quoting Google employee deposition testimony explaining how Google tracks user data). Both Facebook and Google also use certain third party-cookies disguised as "first party" cookies to track users, to avoid third-party cookie blockers.

[24] Sanitas' Website tracks and transmits data via first-party and third-party cookies. The c_user cookie or Facebook ID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.

uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access and view the user's corresponding Facebook profile.

88. Defendants deprived Plaintiff and Class Members of their privacy rights when they: (i) implemented Tracking Tools that surreptitiously tracked, recorded and disclosed Plaintiff's and other patients' confidential communications including their PII; (ii) disclosed patients' PHI to unauthorized third parties and (iii) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

89. In fact, several other healthcare providers have sent data breach notification letters to patients who used digital platforms outfitted with Tracking Tools.[25]

90. By installing and implementing both the Pixel and Google Analytics, Sanitas caused Plaintiff's and Class Members' communications to be intercepted by and disclosed to Facebook and Google and for those communications to be personally identifiable.

91. As explained below, these unlawful transmissions are initiated by Sanitas' source code concurrent with communications made via certain webpages.

**F. Sanitas' Tracking Tools Divulge Patient Information Via its Web Properties.**

92. If a patient uses Sanitas' Web Properties to find care, the Web Properties direct them to communicate PHI including, but not limited to, the reason (*i.e.*, the medical condition or

[25] *See*, *e.g.*, *Cerebral, Inc. Data Breach*, https://www.justice4you.com/blog/cerebral-inc-data-breach.html; *Atrium Health apologizes to patients after data breach*, WCNC CHARLOTTE, https://www.wcnc.com/article/money/consumer/atrium-health-data-breach-apology/275-b1753ae6-81bf-4e83-bceb-fcc05d4e951e; Annie Burky, *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies,* FIERCE HEALTHCARE (October 20, 2022), https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3; *Novant Health Notifies Patients of Potential Data Privacy Incident*, PR NEWSWIRE (August 19, 2022), https://www.prnewswire.com/news-releases/novant-health-notifies-patients-of-potential-data-privacy-incident-301609387.html.

symptoms) for seeking care, the fact that they are booking an appointment, the location where they sought treatment, and their patient status.

93. Unbeknownst to the patient, this communication is sent to Facebook and Google via Sanitas' Tracking Tools, including the location a patient has selected.

94. In the example below, the user navigated to the "Mental Health" module on Sanitas' Web Properties after the user logged into their account:




*Figure 1. Screenshot taken from https://mycare.mysanitas.com/mental-health as the user navigates to this location after logging into their account.*

95. Unbeknownst to patients, this webpage—which is used to communicate PHI for the purpose of seeking medical treatment—contains Sanitas' Tracking Tools.

96. The image below shows the "behind the scenes" portion of the Website that is invisible to ordinary users:



| | |
|---|---|
| _eu | AAAAAAQ |
| uid | bJmsERDiPIN1tMubb8VEjMrtsGP2 |
| sid | 1747416382 |
| sct | 11 |
| seg | 1 |
| dl | https%3A%2F%2Fmycare.mysanitas.com%2Fmental-health |
| dr | https%3A%2F%2Fmycare.mysanitas.com%2Fmental-health |
| dt | mySanitas |
| _s | 3 |
| tfd | 18729 |

**Request Payload**

en=click_keralty&ep.k_id=bJmsERDiPIN1tMubb8VEjMrtsGP2&ep.e_id=1534230&ep.path=%2Fmental-health&ep.text=CLOSE&ep.url=&ep.element=%5Bobject%20HTMLSpanElement%5D&ep.target=&ep.click_id=&_et=1547
en=click_keralty&ep.k_id=bJmsERDiPIN1tMubb8VEjMrtsGP2&ep.e_id=1534230&ep.path=%2Fmental-health&ep.url=&ep.element=%5Bobject%20HTMLButtonElement%5D&ep.target=&ep.click_id=&_et=1585
en=click_keralty&ep.k_id=bJmsERDiPIN1tMubb8VEjMrtsGP2&ep.e_id=1534230&ep.path=%2Fmental-health&ep.url=&ep.element=%5Bobject%20HTMLButtonElement%5D&ep.target=&ep.click_id=&_et=1973

*Figure 2. Screenshot of Sanitas' Website source code when logged into the patient portal, depicting back-end network traffic which reveals to Google that the user is seeking medical services related to mental health.*

97. Thus, without alerting the user, Sanitas' Google Tracking Tools send the communications the user made via the Web Properties to Google, and the images herein confirm that the communications Sanitas sends to Google contain the user's PHI and PII.

98. Sanitas also informed Google about the user viewing lab results and prescribed medications (including details about the type of medication prescribed).




*Figure 3: Screenshot taken of a patient visiting mycare.mysanitas.com/my-health/lab-results to view lab results.*




*Figure 4: Depicting user* PHI and PII *sent to Google including the fact that the user was viewing lab results, the location that the lab results came from (Cool Springs), as well as the fact that a specific test was waived when the lab work was done.*




*Figure 5: Depicting a user visiting mycare.mysanitas.com/my-health/current-Medication to view prescribed medication.*




*Figure 6: Depicting user PHI sent to Google including the fact that the user was viewing this list of medications and even the name of the prescribed medication.*

99. In each of the examples above, the user's website activity and the contents of their communications are sent to Google alongside their PII.

100. Several different methods allow marketers and third parties to identify individual website users, but the examples above demonstrate what happens when the website user is logged into their Google account on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with Google Analytics.




*Figure 7: Sanitas' Website's source code reveals that a User's unique identifiers are shared with Google including the CID cookie.*

101. This works similarly to communications that are shared with Facebook via the Meta Pixel. In the example below, the user navigated to "book appointment" pages for various providers:






*Figures 8-9: Depicting Sanitas' use of the Meta Pixel to capture a Book Appointment event and utilization of Facebook's _fbp cookie.*




*Figures 10-11: Depicting the Network traffic report showing the data sent to Facebook including a Book Appointment event and the c_user personal identifier.*

102. Sanitas does not disclose that Google Analytics, Google DoubleClick Ads, Meta Pixel or any other Tracking Tools embedded in the Website's source code track, record, and transmit Plaintiff's and Class Members' PHI and PII to Facebook and Google. Moreover, Sanitas never received consent or written authorization to disclose Plaintiff's and Class Members' private communications to Facebook or Google.

**G. Sanitas' Conduct is Unlawful and Violated Industry Norms.**

***i. Sanitas Violated its own Notice of Privacy Practices.***

103. Sanitas' Notice of Privacy Practices represent to Plaintiff and Class Members that Sanitas will keep PHI and PII private and confidential and Sanitas will only disclose PHI under certain circumstances, none of which apply here.

104. Sanitas' Notice of Privacy Practices explains Sanitas' legal duties with respect to PHI and PII and the exceptions for when Sanitas can lawfully use and disclose it.

105. Sanitas' Notice of Privacy Practices states that Sanitas is "committed to maintaining the privacy and confidentiality of your health information[,]" and acknowledges that Sanitas is "required by law to maintain the privacy and security of your protected health information."[26]

106. The Notice of Privacy Practices further states that Sanitas "will let you know promptly if a breach occurs that may have compromised the privacy and security of your health information. [Sanitas] must follow the duties and privacy practices described in this Notice and give you a copy of it. [Sanitas] ***will not use or share your information*** other than as described in this Notice ***unless you tell us we can in writing***."[27]

---

[26] https://www.mysanitas.com/en/legal/notice-privacy-practices.

[27] *Id.*

107. Sanitas informs Website users that "[y]our 'protected health information' means any written, electronic or oral health information about you, including demographic data that can be used to identify you." [28]

108. Sanitas' Notice of Privacy Practices further outlines how Sanitas may use and disclose medical information for treatment, payment, healthcare operations, health-related benefits and services, to individuals involved in patient care or payment for your care and special purposes when permitted or required by law.[29]

109. The effective date of the Notice of Privacy Practices is August 24, 2015. [30]

110. At no point did Sanitas seek such authorization from Plaintiff before transmitting PHI to a third party for marketing purposes.

111. Sanitas violated its own Notice of Privacy Practices by unlawfully disclosing Plaintiff's and Class Members' PHI and PII to Meta (Facebook), Google, and likely other third parties without written authorization.

112. Sanitas' transmission of PHI to third parties such as Google and Facebook violated its own Notice of Privacy Practices, in which Sanitas acknowledges that "[w]e are required by law to maintain the privacy and security of your protected health information."[31]

113. Sanitas further violated its Privacy Notice because it never notified Plaintiff that his PHI had been breached by permitted Google and others to intercept it without their consent.

---

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

***ii. Sanitas Violated HIPAA Standards.***

114. Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient or household member of a patient for marketing purposes without the patients' express written authorization.[32]

115. The HIPAA Privacy Rule "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[33]

116. The Privacy Rule broadly defines PHI as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

117. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

118. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated

[32] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[33] *HIPAA For Professionals*, https://www.hhs.gov/hipaa/for-professionals/index.html.

recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

> A. Names;
>
> ***
>
> H. Medical record numbers;
>
> ***
>
> J. Account numbers;
>
> ***
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers; … and
>
> R. Any other unique identifying number, characteristic, or code…; and"
>
> The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."[34]

119. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

120. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained

[34] 45 C.F.R. § 160.514.

by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

121. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Sanitas when it is knowingly disclosing IIHI relating to an individual, as those terms are defined under HIPAA.

122. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

123. In its *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[35]

124. HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or

[35] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

> disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (emphasis added).[36]

125. As such, Sanitas' actions violated HIPAA.

***iii. Unique Personal Identifiers are Protected Health Information.***

126. While not all health data is covered under HIPAA, the law specifically applies to healthcare providers, health insurance providers and healthcare data clearinghouses.[37]

127. The HIPAA privacy rule sets forth policies to protect all IIHI that is held or transmitted, and there are approximately 18 HIPAA identifiers that are considered PII. This information can be used to identify, contact or locate a single person or can be used with other sources to identify a single individual.

128. These HIPAA identifiers, as relevant here, include names, device identifiers, dates related to an individual, email addresses, web URLs and IP addresses.[38]

129. Sanitas improperly disclosed Plaintiff's and Class Members' HIPAA identifiers, including their names, email addresses, phone numbers, dates they sought treatments, computer IP addresses, device identifiers, and web URLs visited, to Google and its affiliates through their use

---

[36] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[37] *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network Was Giving Kids' Information to Facebook* (June 21, 2022), available at *https://themarkup.org/pixel-hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-facebook* (stating that "[w]hen you are going to a covered entity's website, and you're entering information related to scheduling an appointment, including your actual name, and potentially other identifying characteristics related to your medical condition, there's a strong possibility that HIPAA is going to apply in those situations") (last visited Nov. 29, 2023).

[38] *See Guidance Regarding Methods for De-identification of Protected Health Information*, *supra* note 35.

of Google Analytics *in addition to* PHI such as medical services selected, patient status, medical conditions, treatments, and appointment information.

130. An IP address is a number that identifies the address of a device connected to the Internet. IP addresses are used to identify and route communications on the Internet. IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

131. Google tracks every IP address associated with a Google user and Internet users. Facebook also tracks IP addresses associated with a Facebook user.

132. Google, Facebook, and other third-party marketing companies track IP addresses for targeting individual homes and their occupants with advertising.

133. Under HIPAA, an IP address is considered IIHI, defining personally identifiable information as including "any unique identifying number, characteristic or code" and specifically listing IP addresses among examples. 45 C.F.R. § 164.514 (2).

134. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

135. Consequently, Sanitas' disclosure of Plaintiff's and Class Members' unique personal identifiers violated HIPAA and industry-wide privacy standards.

**H. Plaintiff's and Class Members' Reasonable Expectation of Privacy.**

136. Plaintiff and Class Members were aware of Sanitas' duty of confidentiality when they sought medical services from Sanitas.

137. At all times when Plaintiff and Class Members provided their PHI and PII to Sanitas, they each had a reasonable expectation that the information would remain private and that Sanitas would not share it with third parties for a commercial purpose, unrelated to patient care.

138. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

139. For example, a Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[39]

140. Personal data privacy and obtaining consent to share PHI and PII are material to Plaintiff and Class Members.

141. Plaintiff and Class Members would not have used Sanitas' Web Properties, would not have provided their PHI and PII to Sanitas and would not have paid for Sanitas' healthcare services or would have paid less for them, had they known that Sanitas would disclose their PHI and PII to third parties.

142. Plaintiff's and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Sanitas' status as a healthcare provider, Sanitas' common law obligation to maintain the confidentiality of patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of

[39] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-lessconfident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Sanitas' express and implied promises of confidentiality.

**I. Sanitas was Enriched and Benefitted from its Use of Tracking Tools.**

143. One of the primary reasons that Sanitas decided to embed Google Analytics and other Tracking Tools on its Web Properties was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data for Sanitas' own benefit in the absence of express written consent.

144. Sanitas' use of PHI after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of Plaintiff's and Class Members' privacy.

145. In exchange for disclosing PHI and PII of its patients, Sanitas is compensated by Google and Facebook in the form of enhanced advertising services and more cost-efficient marketing.

146. Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions.

147. For example, when a user makes an appointment on the Website, that information is sent to Google. Because Sanitas wants to get more potential patients to come to its Website and to sign up for Sanitas' medical services, Google will then use the data received from Sanitas' Website and its own treasure trove of data to find more users to click on a Sanitas ad that are more likely to "convert," i.e. make an appointment at one of Sanitas' clinics.

148. As part of its marketing campaign, Sanitas re-targeted patients and potential patients to get more visitors to come to its Website and to use its services. Sanitas did so through the use of intercepted patient data they obtained and disclosed without express written consent.

149. Companies have started to warn about the potential HIPAA violations associated with using pixels and Tracking Tools because many such trackers are not HIPAA-compliant or are only HIPAA-compliant if certain steps are taken.[40]

150. For example, Freshpaint, a healthcare marketing vendor, cautioned that "Meta isn't HIPAA-compliant. They don't sign BAAs, and the Meta Pixel acts like a giant personal user data vacuum sending PHI to Meta servers," and "[i]f you followed the Facebook (or other general) documentation to set up your ads and conversion tracking using the Meta Pixel, remove the Pixel now.[41]

151. Medico Digital also warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly, it could have serious consequences."[42]

152. By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed PHI and PII, thereby benefitting Sanitas while invading the privacy of Plaintiff and Class Members and violating their rights under federal and Florida law.

**J. Plaintiff's and Class Members' PHI and PII has Financial Value.**

153. Plaintiff's and Class Members' PHI and PII has economic value and Sanitas' disclosures harmed Plaintiff and Class Members.

---

[40] *See The guide to HIPAA compliance in analytics*, https://campaign.piwik.pro/wp-content/uploads/2023/10/The-guide-to-HIPAA-compliance-in-analytics.pdf (explaining that Google Analytics 4 is not HIPAA-compliant).

[41] *How to Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking* (Mar. 14, 2023), https://www.freshpaint.io/blog/how-to-make-facebook-ads-hipaa-compliant-and-still-get-conversion-tracking.

[42] *The complex world of healthcare retargeting* (July 10, 2023), https://www.medicodigital.com/the-complicated-world-of-healthcare-retargeting/.

154. Facebook regularly uses the data that it acquires to create Core and Custom Audiences as well as Lookalike Audiences and then sells that information to advertising clients.

155. Google, similarly, sells the user data it acquires, to third parties for advertising.

156. Plaintiff's and Class Members' PHI and PII has considerable value as highly monetizable data especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

157. Sanitas, Google and Facebook profit from their use of Plaintiff's and Class Members' personal data to target them with advertising and for other economic benefits, such as improving their internal operations.

158. The value of health data in particular is well-known, and the value of personal data is generally accepted as a form of currency.

159. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

160. Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[43]

161. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[44]

---

[43] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry* (January 9, 2017)*,* https://time.com/4588104/medical-data-industry/.

[44] *See Hospital execs say they are getting flooded with requests for your health data* (December 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

162. In The Age of Surveillance Capitalism, Harvard Business School Professor Shoshanna Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed their business models from fee for services provided to customers to monetizing their user's data—including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[45] In essence, Professor Zuboff explains that revenue from Internet user data pervades every economic transaction in the modern economy. It is a fundamental assumption of these revenues that there is a market for this data.

163. Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[46]

164. Likewise, in The Wall Street Journal, former fellow at the Open Society Institute and the principal technologist at the ACLU Christopher Soghoian (currently working for Senator Ron Wyden as the senator's Senior Advisor for Privacy & Cybersecurity) noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free

---

[45] Shoshanna Zuboff, THE AGE OF SURVEILLANCE CAPITALISM 166 (2019).

[46] Paul M. Schwartz, Property, *Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

> content, the terms of this exchange were never clearly communicated to consumers.[47]

165. Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

166. Facebook has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

167. Meta "generate[s] substantially all of [its] revenue from advertising."[48]

168. Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions. The monetary value to Plaintiff and Class Members of their sensitive medical information that Sanitas shared with Google and others without consent—such as Plaintiff's and Class Members' intent to purchase certain medical products and inferences that Plaintiff and Class Members had particular health conditions that were treated by those medical products—was forever diminished by Sanitas' disclosure of that information to Google and others.

---

[47] Julia Angwin, How Much Should People Worry About the Loss of Online Privacy?, THE WALL STREET JOURNAL (Nov. 15, 2011).

[48] Meta 2022 Annual Report at 17.

169. Policymakers are proactively calling for a revision and potential upgrade of the HIPAA privacy rules out of concern for what might happen as tech companies continue to march into the medical sector.[49]

170. PHI and PII is also a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use PHI and PII to commit an array of crimes that include identity theft and medical and financial fraud.[50] A robust "cyber black market" exists where criminals openly post stolen PII and health information on multiple underground Internet websites, commonly referred to as the dark web.

171. As Professors Acquisti, Taylor, and Wagman relayed in their 2016 article "The Economics of Privacy," published in the Journal of Economic Literature: "Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her clickthroughs, comments posted online, photos uploaded to social media, and so forth) are increasingly regarded as business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties."[51]

172. User-correlated URLs have monetary value. They also have non-monetary, privacy value. For example, in a study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important"

---

[49] *Id.*

[50] FTC, *What To Know About Identity Theft, available at*: https://consumer.ftc.gov/articles/what-know-about-identity-theft.

[51] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. OF ECON. LITERATURE 2, at 444 (June 2016). https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf

for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.[52]

173. While credit card information can sell for as little as $1–$2 on the black market, IIHI can sell for as much as $363.[53]

174. IIHI is particularly valuable because criminals can use it to target victims with frauds that take advantage of their medical conditions.[54]

175. IIHI can also be used to create fraudulent insurance claims and facilitate the purchase and resale of medical equipment, and it can help criminals gain access to prescriptions for illegal use or sale.[55]

176. Medical identity theft can result in inaccuracies in medical records, costly false claims, and life-threatening consequences. If a victim's health information is commingled with other records, it can lead to misdiagnoses or mistreatment.

177. The FBI Cyber Division issued a *Private Industry Notification* on April 8, 2014, that advised the following:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more

---

[52] *How Americans View Data Privacy*, PEW RESEARCH CENTER (October 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

[53] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*: https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/.

[54] *Id.*

[55] *Id.*

> difficult to detect, taking almost twice as long as normal identity theft.[56]

178. Cybercriminals often trade stolen PII on the black market for years following a breach or disclosure. Stolen PII can be posted on the Internet, making it publicly available.

179. In particular, the value of health data is well-known and various reports have been conducted to identify its value.

180. Specifically, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[57]

181. The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold is evidence of the value of PHI.

182. Personal information has been recognized by courts as extremely valuable. *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

[56] *FBI Cyber Division Private Industry Notification* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[57] *See* https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf.

183. In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

184. Sanitas gave away Plaintiff's and Class Members' sensitive communications and transactions on its Web Properties without permission, to unauthorized third-party data brokers like Google and Facebook.

185. The unauthorized access to Plaintiff's and Class Members' PHI and PII has diminished the value of that information, resulting in harm to users of the Web Properties , including Plaintiff and Class Members.

**PLAINTIFF YOUSEF ALHINDI'S RESPRESENTATIVE EXPERIENCE**

186. As a condition of receiving Sanitas' services, Plaintiff Alhindi disclosed his PHI and PII to Sanitas on numerous occasions, and most recently in December of 2023.

187. Plaintiff Alhindi accessed Sanitas' Web Properties on his phone to receive healthcare services from Sanitas and at Sanitas' direction.

188. Plaintiff Alhindi used Sanitas' Web Properties to request and book doctor's appointments for himself, request referrals to other practitioners, view lab results, as well as search for and communicate PHI related to his need for medical care for multiple sinus infections.

189. His searches for and communication of PHI and PII included his visiting specific webpages that revealed his PHI through the URLs as well as his selection of a specific provider to book appointments.

190. His communication of PHI also included insurance information, information about medications prescribed, as well as information on what conditions his appointments were for, such as sinus infection symptoms.

191. Plaintiff Alhindi has used and continues to use the same devices to maintain and access active Google and Facebook accounts throughout the relevant period in this case and has had an active Facebook account since approximately 2014.

192. Plaintiff Alhindi reasonably expected that his communications with Sanitas via the Web Properties were confidential, solely between himself and Sanitas, and that such communications would not be transmitted to or intercepted by a third party.

193. Prior to receiving or paying for healthcare services from Sanitas, Plaintiff Alhindi read, signed an acknowledgment of receipt, and relied upon Sanitas' representations and promises in its Privacy Notice that it would never "use or disclose [his] health information for marketing purposes or sell [his] health information, unless [he has] signed an authorization."

194. However, as a result of the Tracking Tools Sanitas chose to install on its Website, Plaintiff Alhindi's PHI and PII was intercepted, disclosed, viewed, analyzed and used by unauthorized third parties.

195. Sanitas transmitted Plaintiff Alhindi's Google identifiers, computer IP address, Facebook ID, and other device and unique online identifiers to Facebook. Sanitas also transmitted information such as health and medical information including Plaintiff's particular health condition, the type of medical treatment sought, medications prescribed, patient status and the fact that Plaintiff attempted to or did book a medical appointment.

196. Plaintiff Alhindi never consented to the disclosure, receipt, or use of his PHI and PII by third parties or to Sanitas enabling third parties, including Facebook and Google, to access or interpret such information.

197. Notwithstanding, through the Tracking Tools embedded on Sanitas' Web Properties, Sanitas transmitted Plaintiff Alhindi's PHI and PII to, at a minimum, Google and Facebook (and likely other third parties).

198. Plaintiff Alhindi values his privacy and never shares his health information on Facebook or other social media.

199. Plaintiff Alhindi also seeks to use the privacy of his information, including his health information, to increase its value and participate in the personal data marketplace in the future. But because Sanitas gave that information to Google without Plaintiff Alhindi's consent, his health information is no longer private and its value in the personal data marketplace has decreased, as it is already available to advertisers and attached to his consumer profile.

200. Plaintiff Alhindi would not have utilized Sanitas' medical services or Web Properties or would have paid much less for Sanitas' services had he known that his PHI and PII would be captured and disclosed to third parties like Facebook and Google without his consent.

201. Plaintiff Alhindi overpaid for healthcare services and did not get the full value for what he paid because Sanitas materially misrepresented and broke its promises regarding how it would manage his PHI.

202. Plaintiff Alhindi would not have paid for healthcare services from Sanitas and would have chosen a different healthcare provider had he known that Sanitas would send his PHI to Google, Facebook, or other third parties without consent.

203. Since he used the Web Properties to communicate his medical symptoms and to book appointments for his health conditions, as a result of Sanitas' use of Tracking Tools, Plaintiff Alhindi received targeted advertisements online and on his social media including his Meta accounts, related to the medical conditions that he sought treatment for from Sanitas.

204. By making these disclosures without his consent, Sanitas breached Plaintiff Alhindi's privacy and unlawfully disclosed his PHI and PII.

205. Sanitas did not inform Plaintiff Alhindi that it had shared his PHI and PII with Google.

206. By its systematic processes for targeting individuals based on their traits—in this case, their medical symptoms and healthcare appointments—Google repeatedly viewed and analyzed Plaintiff Alhindi's PHI and PII, which Sanitas disclosed through the Tracking Tools, so that it could match Plaintiff Alhindi with advertisers looking for a consumer who may be interested in particular products and services. By so doing, Google sold to advertisers its ability to target Plaintiff Alhindi based on its knowledge of his medical conditions—knowledge that it only obtained based on Sanitas' use of the Tracking Tools.

207. As a result, Plaintiff Alhindi has experienced emotional distress, anxiety, embarrassment, and humiliation regarding how Sanitas violated his privacy rights through its actions and did so in contradiction to his reasonable expectation of privacy from his medical provider and in flagrant disregard for his rights under HIPAA and state law.

208. Plaintiff Alhindi has a continuing interest in ensuring that his PHI and PII, which, upon information and belief, remains backed up in Sanitas' possession, is protected and safeguarded from future unauthorized disclosure(s).

## CLASS ACTION ALLEGATIONS

209. This action is brought by the named Plaintiff on their behalf and on behalf of a proposed Classes of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3) and 23(c)(4).

210. The Class that Plaintiff seeks to represent is defined as follows:

> All persons residing in the United States whose PHI and PII was disclosed to a third party without authorization or consent through Tracking Tools on Sanitas' Web Properties.

211. Excluded from the proposed Class are any claims for personal injury, wrongful death or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

212. Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded or otherwise modified.

213. **<u>Numerosity</u>.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 1 million patients that have been impacted by Sanitas' actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Sanitas.

214. **<u>Commonality</u>.** Common questions of law or fact arising from Sanitas' conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Sanitas had a duty to protect the PHI and PII of Plaintiff and Class Members;

b) Whether Sanitas had duties not to disclose the PHI and PII of Plaintiff and Class Members to unauthorized third parties;

c) Whether Sanitas violated its own privacy policies by disclosing the PHI and PII of Plaintiff and Class Members to Facebook and Google;

d) Whether Sanitas adequately, promptly and accurately informed Plaintiff and Class Members that their PHI and PII would be disclosed to third parties;

e) Whether Sanitas violated the law by failing to promptly notify Plaintiff and Class Members that their PHI and PII was being disclosed without their consent;

f) Whether Sanitas adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' PHI and PII;

g) Whether Sanitas engaged in unfair, unlawful or deceptive practices by failing to keep the PHI and PII belonging to Plaintiff and Class Members free from unauthorized disclosure;

h) Whether Sanitas violated the federal and state statutes asserted as claims in this Complaint;

i) Whether Plaintiff and Class Members are entitled to actual, consequential and nominal damages as a result of Sanitas' wrongful conduct;

j) Whether Sanitas knowingly made false representations as to their data security and privacy policy practices;

k) Whether Sanitas knowingly omitted material representations with respect to their data security and privacy policy practices; and

l) Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Sanitas' disclosure of their PHI and PII.

215. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's PHI and PII, like that of every other Class Member, was compromised as a result of Sanitas' incorporation and use of the Tracking Tools.

216. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class, and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

217. **Predominance.** Sanitas has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully

stored and disclosed to unauthorized third parties, including Facebook and Google, in the same way. The common issues arising from Sanitas' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

218. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would, therefore, have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Sanitas. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

219. **Policies Generally Applicable to the Class.** Sanitas has acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief and corresponding declaratory relief are appropriate on a class-wide basis.

220. **Ascertainability & Notice.** Membership in the Class can be determined by objective records maintained by Sanitas, and adequate notice can be given to Class Members directly using information maintained in Sanitas' records.

221. **Class-wide Injunctive Relief.** Unless a Class-wide injunction is issued, Sanitas may continue in its failure to properly secure the PHI and PII of Class Members, Sanitas may continue to refuse to provide proper notification to Class Members regarding the practices

complained of herein, and Sanitas may continue to act unlawfully as set forth in this Complaint as Sanitas has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

222. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Sanitas owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing and safeguarding their PHI and PII and not disclosing it to unauthorized third parties;

b) Whether Sanitas breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using and safeguarding their PHI and PII;

c) Whether Sanitas failed to comply with their own policies and applicable laws, regulations and industry standards relating to data security;

d) Whether Sanitas adequately and accurately informed Plaintiff and Class Members that their PHI and PII would be disclosed to third parties;

e) Whether Sanitas failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f) Whether Class Members are entitled to actual, consequential and nominal damages and injunctive relief as a result of Sanitas' wrongful conduct.

## CAUSES OF ACTION

## COUNT I

**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1), *et seq.***
**Unauthorized Interception, Use and Disclosure**
**(*On Behalf of Plaintiff & the Class*)**

227. Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

228. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

229. The ECPA protects both sent and received communications.

230. The ECPA, specifically 18 U.S.C. § 2520(a), provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed or intentionally used in violation of Chapter 119.

231. The transmissions of Plaintiff's and Class Members' PHI and PII to Sanitas via Sanitas' Web Properties is a "communication" under the ECPA's definition under 18 U.S.C. § 2510(12).

232. The transmission of PHI and PII between Plaintiff and Class Members and Sanitas via their Web Properties is a "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

233. The ECPA defines "content" when used with respect to electronic communications to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

234. The ECPA defines "interception" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

235. The ECPA defines "electronic, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Sanitas, Meta and Google use to track Plaintiff's and Class Members' communications;

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' computing devices;

d. Sanitas' web-servers and

e. The Tracking Tools deployed by Sanitas to effectuate the sending and acquisition of users' and patients' sensitive communications.

236. Plaintiff's and Class Members' interactions with Sanitas' Web Properties are electronic communications under the ECPA.

237. By utilizing and embedding the Tracking Tools and, upon information and belief, Conversions API on their Web Properties and servers, Sanitas intentionally intercepted, endeavored to intercept and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

238. Specifically, Sanitas intercepted Plaintiff's and Class Members' electronic communications via the Tracking Tools and Conversions API, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' PHI and PII to Facebook and Google.

239. Furthermore, Sanitas intercepted the "contents" of Plaintiff's communications in at least the following forms:

a. The parties to the communications;

b. PII such as patients' IP addresses, Facebook IDs, unique Google identifiers, browser fingerprints and other unique identifiers;

c. Patient communications about specific medical conditions;

d. The precise dates and times when patients click to Log-In on Sanitas' Web Properties;

e. Patient communications about specific treatments;

f. The precise text of specific buttons on Sanitas' Web Properties that patients click to exchange communications including mental health assessments;

g. Information that is a general summary or informs third parties of the subject of communications that Sanitas sends back to patients in response to requests for information about specific conditions, treatments, payment and other information.

240. Sanitas intercepted communications that included, but are not limited to, communications to/from Plaintiff and Class Members regarding PHI and PII, including unique Facebook and Google IDs, IP addresses, and health information relevant to the screenings and treatment plans in which Plaintiff and Class Members participated.

241. Whenever Plaintiff and Class Members interacted with Sanitas' Web Properties, Sanitas, through the Tracking Tools embedded and operating on their Web Properties, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class Members' electronic communications to third parties, including Facebook and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

242. Whenever Plaintiff and Class Members interacted with Sanitas' Web Properties, Sanitas, through the Tracking Tools embedded and operating on their Web Properties, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing health care services

to Plaintiff and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. *See* 18 U.S.C. § 2511(1)(d).

243. Whenever Plaintiff and Class Members interacted with Sanitas' Web Properties, Sanitas, through the Tracking Tools it embedded and operated on their Web Properties, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

244. Sanitas intentionally used wire or electronic communications to increase its profit margins. Sanitas specifically used the Tracking Tools and Conversions API to track and utilize Plaintiff's and Class Members' PHI and PII for its own financial benefit.

245. Sanitas was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

246. Plaintiff and Class Members did not authorize Sanitas to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy via the Tracking Tools and Conversions API.

247. Any purported consent that Sanitas received from Plaintiff and Class Members was not valid.

248. Sanitas intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State—namely, violations of HIPAA, and invasion of privacy, among others.

249. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

250. Sanitas is a "party to the communication" with respect to patient communications. However, Sanitas' simultaneous, unknown duplication, forwarding and interception of Plaintiff's and Class Members' PHI and PII does not qualify for the party exemption.

251. In sending and acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Sanitas' Web Properties, creation of accounts, participation in Sanitas' health screenings, Sanitas' purpose was tortious and designed to violate federal and state law, including as described above, a knowing intrusion into a private place, conversation or matter that would be highly offensive to a reasonable person.

252. Sanitas' acquisition of patient communications that were used and disclosed to Facebook, Google, and other third parties was also done for purposes of committing criminal and tortious acts in violation of the laws of the United States, as well as various common law causes of action.

253. Additionally, through the above-described Tracking Tools and intercepted communications, this information was, in turn, used by Facebook and Google to 1) place Plaintiff in specific health-related categories and 2) target Plaintiff with particular advertising associated with Plaintiff's specific health conditions.

254. Here, as alleged above, Sanitas violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing IIHI to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) ***relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual***, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[58]

255. Plaintiff's information that Sanitas disclosed to third parties qualifies as IIHI, and Sanitas violated Plaintiff's expectations of privacy and constitutes tortious and criminal conduct through a violation of 42 U.S.C. § 1320d(6). Sanitas used the wire or electronic communications to increase its profit margins. Sanitas specifically used the Pixel to track and utilize Plaintiff's and Class Members' PHI and PII for financial gain.

256. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

257. Sanitas' conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization and

b. Disclosed IIHI to Facebook and Google without patient authorization.

258. Sanitas' conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Sanitas' use of the Tracking Tools was for Sanitas' commercial advantage to increase revenue from existing patients and gain new patients.

259. Consumers have the right to rely upon the promises that companies make to them. Sanitas accomplished its tracking through deceit and disregard, such that an actionable claim may

---

[58] § 1320d-(6) (emphasis added).

be made, in that it was accomplished through source code that cause Meta Pixels and cookies (including but not limited to the fbp, _ga and _gid cookies) to be deposited on Plaintiff's and Class Members' computing devices as "first-party" cookies that are not blocked.

260. The fbp, _ga, and _gid cookies, which constitute programs, commanded Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Sanitas to Facebook and Google and others.

261. Sanitas knew or had reason to know that the fbp, _ga, and _gid cookies would command Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Sanitas to Facebook and Google.

262. Sanitas' scheme or artifice to defraud consists of:

a. the false and misleading statements and omissions in its privacy policy set forth above, including the statements and omissions recited in the claims below and

b. the placement of the 'fbp,' _ga and _gid cookies on patient computing devices disguised as a first-party cookie on Sanitas' Web Properties rather than third-party cookies from Meta and Google.

263. As such, Sanitas cannot viably claim any exception to ECPA liability.

264. As a direct and proximate result of Sanitas' violation of the ECPA, Plaintiff and Class Members were damaged by Sanitas' conduct.

265. As a result of Sanitas' violation of the ECPA, Plaintiff and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT II

**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**Fla. Stat. §§ 501.201, *et seq.* ("FDUTPA")**
**(On Behalf of Plaintiff & the Class)**

266. Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

267. Sanitas engages in the conduct alleged in this Complaint that resulted in the disclosure of Plaintiff and Class Members PII and PHI, which constitutes "unconscionable acts or practices, and unfair or deceptive acts or practices" in the conduct of commerce. Fla. Stat. § 501.204.

268. Defendants engaged in, and its acts and omissions affect, trade and commerce. Defendants' acts, practices, and omissions were done in the course of Defendants' business of providing and marketing their healthcare services.

269. Defendants, operating in Florida, engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1), including but not limited to the following: (1) promising to protect Plaintiff's and Class Members' PHI and PII via its Privacy Policies and then, in fact, knowingly, transmitting Plaintiff's and Class Members' PHI and PII to third parties, such as Facebook and Google; (2) unlawfully disclosing Plaintiff's and Class Members' PHI and PII to Facebook and Google; (3) failing to disclose or omitting material facts that that Plaintiff's and Class Members' PHI and PII would be disclosed to third parties; (4) failing to obtain Plaintiff's and Class Members' consent in transmitting Plaintiff's and Class Members' PHI and PII to Facebook and Google; and (5) knowingly violating industry and legal standards regarding the protection of Plaintiff's and Class Members' PHI and PII.

270. These actions also constitute deceptive and unfair acts or practices because Sanitas

knew its Web Properties contained the Pixel and Google Analytics and also knew the Pixel and Google Analytics would be unknown and not easily discoverable by Plaintiff and Class Members.

271. Sanitas intended that Plaintiff and Class Members rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendants' offering of goods and services.

272. Had Defendants disclosed to Plaintiff and Class Members that the Web Properties were transmitting PHI and PII to Facebook and Google, Plaintiff and the Class Members would not have provided their PHI and PII to Defendants.

273. Defendants' wrongful practices were and are injurious to the public because those practices were part of Sanitas' generalized course of conduct that applied to the Class. Plaintiff and the Class have been adversely affected by Defendants' conduct and the public was and is at risk as a result thereof.

274. As a result of Sanitas' wrongful conduct, Plaintiff and Class Members were injured in that they never would have provided their PHI and PII to Sanitas, or purchased Sanitas' services, had they known or been told that Sanitas failed to maintain sufficient security to keep their PHI and PII from being taken and misused by others.

275. As a direct and proximate result of Defendants' violations of the FDUPTA, Plaintiff and Class Members have suffered harm, including, without limitation loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, the loss of privacy of their highly sensitive medical information (such as disclosure of medical conditions and symptoms), loss of confidentiality, embarrassment and substantial risk of embarrassment from the disclosure of that information to unauthorized third parties, diminution in value of their PHI and PII, emotional distress, humiliation and loss of enjoyment of life.

276. The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

277. Defendants' actions and inactions in engaging in the unfair practices and deceptive acts described herein were negligent, knowing and willful, and/or wanton and reckless.

278. As a direct result of Defendants' knowing violation of the FDUPTA, Plaintiff and Class Members are entitled to damages as well as injunctive relief requiring Sanitas to (i) strengthen its data security systems and monitoring procedures; (ii) cease sharing Plaintiff's and Class Members' PHI and PII with Meta, Google and other third parties without Plaintiff's and Class Members' express consent; and (iii) submit to future annual audits of its security systems and monitoring procedures.

279. Plaintiff and Class Members seek relief under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*, including, but not limited to, damages, restitution, injunctive relief, attorney fees and costs, and any other just and proper relief.

## COUNT III

### INVASION OF PRIVACY—
### INTRUSION UPON SECLUSION
***(On Behalf of Plaintiff & the Class)***

280. Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

281. Plaintiff and Class Members had a legitimate expectation of privacy regarding their PII and PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

282. Sanitas owed a duty to Plaintiff and Class Members to keep their PII and PHI confidential.

283. The unauthorized disclosure and acquisition by a third party of Plaintiff's and Class Members' PII and PHI is highly offensive to a reasonable person.

284. Sanitas' willful and intentional disclosure of Plaintiff's and Class Members' PII and PHI constitutes an intentional interference with Plaintiff's and Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

285. Sanitas' conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Sanitas facilitated Facebook's simultaneous eavesdropping and wiretapping of confidential communications.

286. Sanitas failed to protect Plaintiff's and Class Members' PHI and PII and acted with a knowing state of mind when it incorporated the Tracking Tools into its Web Properties because it knew the functionality and purpose of the Tracking Tools.

287. Because Sanitas intentionally and willfully incorporated the Tracking Tools into its Web Properties and encouraged patients to use those Web Properties for healthcare purposes, Sanitas had notice and knew that its practices would cause injury to Plaintiff and Class Members.

288. As a proximate result of Sanitas' acts and omissions, the private and sensitive PII and PHI of Plaintiff and Class Members were disclosed to a third party without authorization, causing Plaintiff and the Class to suffer damages.

289. Plaintiff, individually and on behalf of the Class Members, seeks compensatory damages for Sanitas' invasion of privacy, which includes the value of the privacy interest invaded

by Sanitas, loss of time and opportunity costs, punitive damages, plus prejudgment interest, and costs.

290. Sanitas' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII and PHI are still maintained by Sanitas and still in the possession of Facebook and Google and the wrongful disclosure of the information cannot be undone.

291. Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Sanitas' continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Sanitas' disclosure of the information to Facebook or Google, who on information and belief continues to possess and utilize that information.

292. Plaintiff, individually and on behalf of the Class Members, further seeks injunctive relief to enjoin Sanitas from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' PII and PHI and to adhere to its common law, contractual, statutory, and regulatory duties.

## COUNT IV

## BREACH OF CONFIDENCE
**(*On Behalf of Plaintiff & the Class*)**

293. Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

294. Possessors of non-public medical information, such as Sanitas, have a duty to keep such medical information completely confidential.

295. Plaintiff and Class Members had reasonable expectations of privacy in the responses and communications entrusted to Sanitas through their Web Properties, which included highly sensitive PHI and PII.

296. Contrary to their duties as telehealth institutions and their express promises of confidentiality, Sanitas installed the Tracking Tools and Conversions API to disclose and transmit to third parties Plaintiff's and Class Members' PHI and PII, including data relating to Plaintiff's and Class Members' health.

297. These disclosures were made without Plaintiff's or Class Members' knowledge, consent or authorization.

298. The third-party recipients included, but may not be limited to, Facebook and Google.

299. As a direct and proximate cause of Sanitas' unauthorized disclosures of Plaintiff's and Class Members' PHI and PII, Plaintiff and Class Members were damaged by Sanitas' breach of confidentiality pursuant to the following injuries:

a. sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Sanitas eroded the essential confidential nature of health services that Plaintiff and Class Members participated in;

d. Sanitas used of something of value (the highly sensitive PHI and PII) that belonged to Plaintiff and Class Members and obtained a benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation to Plaintiff or Class Members for the unauthorized use of such data;

e. Plaintiff's and Class Members' PHI and PII are diminished in value; and

f. Plaintiff and Class Members property rights in their PHI and PII have been violated.

## COUNT V

### NEGLIGENCE
***(On Behalf of Plaintiff & the Class)***

300. Plaintiff repeats the allegations contained in the foregoing paragraphs preceding this Counts Section as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

301. Sanitas required Plaintiff and Class Members to submit sensitive personal information in order to obtain healthcare services.

302. Upon accepting, storing and controlling the PHI and PII of Plaintiff and the Class in its computer systems, Sanitas owed, and continues to owe, a duty to the Plaintiff and the Class to exercise reasonable care to secure, safeguard and protect their highly sensitive PHI and PII from disclosure to third parties.

303. Sanitas breached its duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PHI and PII from unauthorized disclosure.

304. It was reasonably foreseeable that Sanitas' failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PHI and PII through its installation and use of Google Analytics and other Tracking Tools would result in unauthorized third parties, such as Meta or Google, gaining access to such PHI and PII for no lawful purpose.

305. Sanitas' duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' PHI and PII arose due to the special relationship that existed between Sanitas and its patients, which is recognized by statute, regulations, and the common law.

306. Sanitas' duty to use reasonable care in protecting confidential data arose also because Sanitas is bound by industry standards to protect confidential PHI and PII.

307. Sanitas' own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their PHI and PII.

308. Sanitas' misconduct included the failure to (1) secure Plaintiff's and Class Members' PHI and PII; (2) comply with industry standard data security practices; (3) implement adequate website and event monitoring; (4) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of the Tracking Tools and other tracking technologies and (5) prevent unauthorized access to Plaintiff's and Class Members' PHI and PII by sharing that information with Meta, Google, and other third parties. Sanitas' failures and breaches of these duties constituted negligence.

309. As a direct result of Sanitas' breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and Class Members' PHI and PII, Plaintiff and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

310. Sanitas' wrongful actions and inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' PHI and PII constitutes negligence at common law.

311. Plaintiff and Class Members are entitled to compensatory, nominal, and punitive damages, and Plaintiff and Class Members are entitled to recover those damages in an amount to be determined at trial.

312. Sanitas' negligent conduct is ongoing, in that it still holds the PHI and PII of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Sanitas to (i) strengthen its data security systems and monitoring procedures; (ii) cease sharing Plaintiff's and Class Members' PHI and PII

with Google and other third parties without Plaintiff's and Class Members' express consent and (iii) submit to future annual audits of its security systems and monitoring procedures.

## COUNT VI

### BREACH OF IMPLIED CONTRACT
***(On behalf of Plaintiff & the Class)***

313. Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

314. As a condition of utilizing Sanitas' Web Properties and receiving services from Sanitas' medical professionals, Plaintiff and the Class Members provided their PHI and PII and compensation for their medical care.

315. When Plaintiff and Class Members provided their data to Sanitas in exchange for services, they entered into an implied contract pursuant to which Sanitas agreed to safeguard and not disclose their PHI and PII without consent.

316. Plaintiff and Class Members accepted Sanitas' offers and provided their PHI and PII to Sanitas.

317. By providing their PHI and PII and upon Sanitas' acceptance of this information, Plaintiff and Class Members (as one set of parties) and Sanitas (as the other parties) entered into implied-in-fact contracts to keep the provided information private and confidential.

318. This obligation was described in the terms that Sanitas itself represented on its own Notice of Privacy Practices, which Sanitas itself required Plaintiff and Class Members assent to prior to receiving care. Therefore, Sanitas expressly assented to this obligation in these implied contracts.

319. At all relevant times, Sanitas expressly represented in their Privacy Notice, among other things, that "[Sanitas] ***will not use or share your information*** other than as described in this Notice ***unless you tell us we can in writing.***"[59]

320. When Plaintiff and Class Members provided their PHI and PII to Sanitas in exchange for services that included express representations and promises about the privacy and security of their PHI, they entered into an implied contract pursuant to which Sanitas agreed to safeguard and not disclose their PHI without consent.

321. Plaintiff and Class Members accepted Sanitas' offers and provided their PHI and PII to Sanitas.

322. Plaintiff and Class Members relied on Sanitas' representations and promises, including those in their Notice of Privacy Practices, and would not have entrusted Sanitas with their PHI and PII in the absence of an implied contract between them and Sanitas' obligation not to disclose this PHI and PII without consent.

323. Sanitas violated their Notice of Privacy Practices and breached these implied contracts by disclosing Plaintiff's and Class Members' PHI and PII to an unauthorized third party, *i.e.*, Meta and Google.

324. As a direct and proximate result of Sanitas' breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members would not have used Sanitas' services, or would have paid substantially for these services, had they known their PHI and PII would be disclosed.

325. Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Sanitas' breach of implied contract.

---

[59] Notice of Privacy Practices, https://www.mysanitas.com/en/legal/notice-privacy-practices.

## COUNT VII

### UNJUST ENRICHMENT
***(On behalf of Plaintiff & the Class)***

326. Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

327. This count is pled in the alternative to Plaintiff's Breach of Implied Contract.

328. Sanitas benefits from Plaintiff and Class Members and unjustly retained those benefits at their expense.

329. Plaintiff and Class Members conferred a benefit upon Sanitas in the form of PII and PHI that Sanitas collected from Plaintiff and Class Members, without authorization and proper compensation.

330. Sanitas consciously collected and used this information for its own gain, providing Sanitas with economic, intangible and other benefits, including substantial monetary compensation.

331. That is, in exchange for disclosing the PHI and PII of its patients, Sanitas is compensated by Facebook and Google in the form of enhanced advertising services and more cost-efficient marketing on Facebook and through Google ads. By utilizing the Meta Pixel, the cost of advertising and retargeting was reduced, thereby benefiting Sanitas.

332. Sanitas unjustly retained those benefits at the expense of Plaintiff and Class Members because Sanitas' conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

333. The benefits that Sanitas derived from Plaintiff and Class Members were not offered by Plaintiff and Class Member gratuitously and rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Florida for Sanitas to be

permitted to retain any of the revenue or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

334. Sanitas should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Sanitas received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Alhindi, individually on behalf of himself and all others similarly situated, respectfully requests judgment against Sanitas and that this Honorable Court grant the following:

A. an Order certifying the Class and appointing Plaintiff and Counsel to represent such Class;

B. equitable relief enjoining Sanitas from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and disclosure of the PHI and PII of Plaintiff and Class Members;

C. injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members:

D. an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorneys' fees, costs and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded and

G. such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

DATE: June 27, 2025

Respectfully Submitted,

By: */s/ Joshua R. Jacobson*
Joshua R. Jacobson
**JACOBSON PHILLIPS PLLC**
478 E. Altamonte Dr., Suite 108-570
Altamonte Springs, FL 32701
Tel: (407) 720-4057
joshua@jacobsonphillips.com

**PEIFFER WOLF CARR**
**KANE CONWAY & WISE, LLP**
Brandon M. Wise*
One US Bank Plaza, Suite 1950
St. Louis, MO 63101
Ph: (314) 833-4825
bwise@peifferwolf.com

Andrew R. Tate*
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
Ph: (404) 282-4806
atate@peifferwolf.com

**ALMEIDA LAW GROUP LLC**
David S. Almeida*
849 W. Webster Avenue
Chicago, Illinois 60614
Ph: (708) 529-5418
david@almeidalawgroup.com

**pro hac vice* to be sought

*Counsel for Plaintiff & the Proposed Classes*